# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

JEANETTE ALDERSON,                )
                                  )
            Plaintiff,            )
                                  )
    v.                            )        CAUSE NO.: 3:12-CV-305-TLS
                                  )
FERRELLGAS, INC.,                 )
                                  )
            Defendant.            )

## OPINION AND ORDER

According to Plaintiff Jeanette Alderson's Complaint, her former employer, Ferrellgas, Inc., discriminated and retaliated against her in violation of the Americans with Disabilities Act (ADA), retaliated against her in violation of Title VII, subjected her to a hostile work environment based on her gender, and failed to pay her overtime in violation of the Fair Labor Standards Act (FLSA) and Indiana's civil conversion statute. The Defendant has moved for summary judgment [ECF No. 62] on all the claims alleged by the Plaintiff. Also pending is the Defendant's Motion for Relief Due to Destruction of Evidence [ECF No. 60], and the Plaintiff's Motion to Deem Portions of Defendant's Reply Brief in Support of Motion for Summary Judgment Waived or Stricken, or, in the Alternative, Motion for Leave to File Surreply [ECF No. 73]. Each of these motions is accompanied by a brief in support, a response brief, and a reply brief. Additionally, there are also more than 600 pages of exhibits.

The Court, having considered the parties' briefs in their entirety, concludes that summary judgment is warranted in favor of the Defendant. In doing so, the Court finds it unnecessary to strike any briefs (as requested by the Plaintiff), to strike any claims (as requested by the Defendant), to consider arguments waived (as requested by the Plaintiff), or to sanction the Plaintiff (as requested by the Defendant).

## STATEMENT OF FACTS

The facts are largely undisputed, yet the parties arrive at drastically divergent interpretations of the events that precipitated the Plaintiff's termination of employment at Ferrellgas. The Defendant maintains that the Plaintiff lost her customer service job after she refused to acknowledge some of her basic job duties and engaged in unprofessional and insubordinate conduct. According to the Plaintiff, it was because she participated in statutorily protected activity that the Defendant removed significant duties from her, gave her a written warning, and terminated her employment.

### A.      Customer Service Specialist Position

The Defendant sells propane to residential, commercial, and agricultural customers. The Plaintiff began her employment with the Defendant in May 2010 as a part-time Customer Service Specialist (CSS). Before the Defendant hired the Plaintiff, she had her leg amputated slightly below her knee. She wears a prosthetic leg. When she was hired, the Plaintiff did not provide the Defendant with any documentation identifying any restrictions on her work abilities, and did not identify any disability or suggest the need for any accommodation. The Plaintiff began training at the Plymouth Service Center in Plymouth, Indiana. Four other offices, referred to as Service Units, were also part of the Plymouth Service Center. All except one Service Unit was staffed by a CSS. In August 2010, the Plaintiff was transferred to the Francesville Service Unit, where she was the only office employee. The Plaintiff typically worked alone and served as the main contact for customers, both by phone and in person, while drivers made deliveries. The CSS position also provides general administrative support, which means that additional

responsibilities are assigned as needed.

Greg Wetters was the General Manager over the Plymouth Service Center. He reported to Rick O'Connor, the Regional Vice President. Wetters typically worked in the Plymouth office. In November 2010, Wetters assigned the generalized accounts payable tasks to the Plaintiff after receiving her input about time management. Such tasks entail paying bills or paying for an item, keeping receipts, and preparing a spreadsheet reflecting these purchases for submission to Wetters. Wetters estimates that the accounts payable tasks take between 8 and 15 hours per month. In connection with these duties, the Plaintiff received a company-issued credit card called a P-Card. The card allowed the employee to make payments or purchases.

On June 3, 2011, Wetters submitted a request for a P-Card for Twila Eenigenburg, the Lead CSS. Wetters did so because he had concluded that someone other than the Plaintiff should be responsible for accounts payable. On May 12, 2011, the Defendant's corporate accounts payable department had to follow up with Wetters because the Plaintiff had sent in an invoice without Wetters's signature of approval. Additionally, the Plaintiff had become upset to the point of having to leave work early on one occasion. Then, on June 3, she called Wetters three times in rapid succession when she was dealing with a vendor, and then yelled at him when he answered.

Wetters did not immediately reassign the accounts payable responsibilities, but informed the Plaintiff and another CSS that cross-training would occur. On June 10, 2011, the Plaintiff submitted a statement to corporate accounts payable that was missing a receipt, which had to be corrected. On July 13, 2011, corporate accounts payable had to contact the Plaintiff about two invoices that Wetters had not approved before she submitted them. Eventually, the AP duties were transferred to Eenigenburg.

3

**B.      Participation in the Labor Day Parade**

The Defendant was a major participant at the Blueberry Festival held in Plymouth, Indiana, over Labor Day weekend. It was the Defendant's biggest event of the year. As part of the Festival, the Defendant sponsored a balloon glow and its employees would participate in a parade. Wetters considered the company's participation a valuable way to promote itself in the community and as a team-building event for the Ferrellgas employees.

In preparation for the event, one of the CSS's, Angela Haines, inquired by email about shirt sizes for employees and any children that would be participating in the parade. The Plaintiff responded, "I probably won't be going this year." (Email (July 6, 2011), ECF No. 63-35.) Haines replied that she was told the parade was mandatory, and that the summer cookout was after the parade. Haines then followed up with an email to confirm that the parade was Monday, September 5, and that Ed Read, the Operations Manager, said it was mandatory. Alderson wrote: "Well, I didn't know what day it was even on[.] That's fine. Is it a Saturday & is it something we are getting paid for if we need to be at the parade. I don't usually go to parades of any kind because of the crowds, it's hard on my leg, so that has to be something that's considered." (*Id.*) Haines wrote: "No, it[']s on Monday. You can always ride in a truck with someone, then afterward the plan is to have a luncheon and play games and stuff at the office." (*Id.*) The Plaintiff responded that she did not "do well walking or standing in crowds where it's easy to lose balance or get knocked down." (*Id.*) Haines confirmed that the festival drew a large number of people, but assured the Plaintiff that "you wouldn't be expected to walk. You could ride in the truck." She added, "I think they just want all of us to be together and this is the perfect way and like I said a get together afterwards." Haines assumed they would get paid, but was not sure. She

relayed that Wetters wanted the employees to be proud of their company and represent it, and again reiterated that the Plaintiff could ride and would not be expected to walk. The Plaintiff responded that she "just realized it was labor day." She indicated that "it's not going to go well. My husband is already over protect[ive] when it comes to crowds and we usually go out to the camp ground that weekend with his best friend and his wife." (*Id.*) She indicated that she would have to talk to Wetters about it. Haines responded that she would not put the Plaintiff on a list for a shirt until she knew for sure if she was coming. Haines extended the invitation for the company event to the Plaintiff's husband. In the Plaintiff's final response to Haines, she indicated she would talk to Wetters, but was "already stressing about even telling Rodney because of course the crowd thing just gets him worried and then the fact that's [sic] its Labor day weekend, a holiday we already have off from the company." (*Id.*)

On July 18, the Plaintiff emailed Wetters. She wrote that she "heard that we were all required to be in the parade on Labor Day." (Email (July 18, 2011), ECF No. 63-16.) She advised that if she was supposed to attend, she would have to drive about three hours from where she was staying with her husband and friends. She explained, "We have been doing this for the last 20 years or so. Then I will have to drive back that way right after wards for the annual BBQ at the lake we have with whatever of our kids that come on the day. Rodney would not come with since this is a planned holiday weekend that he looks forward to." (*Id.*) The Plaintiff requested that Wetters let her know what was happening that day so she could arrange her schedule and let her husband know what to expect. In response, Wetters emphasized the team building aspect of the event and the opportunity for families to spend time together. He said that the Blueberry Festival Parade was an annual event, and that he needed people who "want to be

there and be apart of a team." He noted that he had repeatedly stressed that it was the single

biggest event of the year, and encouraged the Plaintiff to look at it from a different

perspective—as a team building opportunity. He wrote, "I understand your need to spend time

with our family and I will not stop you from going camping on this weekend, but I also know

you are having some issues with why the team doesn't listen to me and why don't they use me

more in this ro[le]." (*Id.*) He encouraged her to find reasons to be a part of "this huge positive

event" and stated that her negative response was not helping him "foster a positive event out of

this" with other employees. (*Id.*) Wetters concluded,

> I would say if you do not choose to participate fine but do not expect your peers
> and me to take that response as a positive and then how can we say everyone
> needs to come to this event except Jenni. I hope you and your family can find a
> positive in this event and find a way to work it into your plans. I am so excited
> about this event and love spending time with people I don't know and having
> them see another side of me also. We will talk in the future. Thank you for all you
> do.

(*Id.*)[1] The Plaintiff's July 19 response follows:

> Greg,
>
> First of all, I do completely understand why you would want everyone there and
> what you want to build with this. I work hard to try to build up [Ferrellgas] on my
> part everyday. I am not sure what you mean by the rest of your email about
> everyone I have talked to, negative responses, etc . . . . I spoke with Twila about
> her perspective on this and Angel when she asked for my t-shirt size and with
> both of those conversations, I just expressed my concern with the fact that it is a 3
> day holiday that we make plans for with our family. Also don't understand what
> you mean by "The team doesn't listen to me" I work well with everyone here but

---

[1] Events that transpired after this email exchange show that, throughout the remainder of her
employment, the Plaintiff took particular offense to Wetters's comments about how her decision not to
participate in the Blueberry Festival would be viewed. For example, she wanted to know how the
Defendant was dealing with Wetters's statement "that me not doing certain things would make me be
looked upon differently." (8-10-11 Email (Aug. 10, 2011), ECF No. 63-11.) On August 11, 2011, she
expressed her hope that Wetters would be reprimanded for writing that he would look at her differently if
she did not attend the parade. (Email (Aug. 11, 2011), ECF No. 63-11.)

at the same time I am not trying to win a popularity contest and am upset that how everyone feels about me, rather than the job I do would come into play with my daily work or all of a sudden being looked at negatively from them or you if I was not at a parade or event on a weekend we look forward to every year as a family.

(*Id.*) The email continued, and for the first time, the Plaintiff mentioned a concern about her physical limitations:

Do you ever wonder why we haven't been to some events like this. I have trouble navigating through large crowds with my leg. I won't be able to walk the parade that is a given. Anytime I do tackle a place where there may be crowds, I have a handicap pass and have privileges that come along with that. No lines, use my wheelchair, etc.

If I am expected to attend to earn respect from you or everyone else then I will come to the parade. My husband will not come because as I said, he looks forward to the weekend at the cabin and I respect him enough to know he works hard everyday and looks forward to his time off when it's a holiday from work. I am truly upset by some of the context of the email and have dedicated myself to always doing what is needed to help out since I have been employed here.

(*Id.*)

Around this same time, the Regional Vice President, Rick O'Connor, visited the Francesville office. The Plaintiff made no complaints, but O'Connor indicated to the Plaintiff that she looked kind of stressed, inquired whether she was alright, and told her to let him know if she needed anything. Two days later, the Plaintiff emailed O'Connor about concerns "over the last month or so." (Email (July 21, 2011), ECF No. 63-14.) She indicated that her husband advised her to file a complaint with the labor board, but that she "did not want to do that because I truly enjoy my job and am very good and organized at what I do." (*Id.*) She continued,

The fact is I am disabled and am limited to any duties out side of office type work. Several things have come up that all of a sudden I'm expected to do and that could cause me some difficulty. I need to know if me showing concern about this and choosing not to is going to be a big enough deal that I need to look for other employment. I am already concerned just sending you this about whether a reason will come up to have me replaced anyway or not. I can go into details

> further about field type work and how it was presented if you like. . . . My
> administrative skills is what I was hired for and due to my limitations is the only
> type of work I ever apply for. I'm not sure where to go from here but I am upset
> about the issues.

(*Id.*) O'Connor responded that he would be "more than happy to look into any concerns you may

have." (*Id.*) The Plaintiff told O'Connor that, when he had time, she would "go further into the

conversations over the last month and emails" and expressed that she was "limited and do have

a family to consider." O'Connor then inquired what the Plaintiff was "being asked to do." (*Id.*)

The Plaintiff responded:

> There are a few things, To spend the day out in the field to watch tank sets,
> deliveries, service repairs, etc. . . . Walk in the parade on Labor day. It's been
> hinted that door to door sales leads are wanted. Which if I didn't have to worry
> about uneven ground, getting in and out of trucks with that height, I can maybe
> understand doing these things, even as an office CSS, but I do have to worry
> about this everyday. I have stitches now in my stump due to a fall. It's part of
> being an amputee. Walking and heat do not do well with the prosthetic as my
> amputation was not an easy one, there is no way I can spend the day at an event
> like this, that has been presented as mandatory. It's a risk for me to do something
> that would cause another surgery on this leg, I have issues when it comes to meds
> used for surgeries. It's not just my physical limitations that is my concern, it's
> what was said and the implication of what would be if I do not participate with
> the items listed above.

(*Id.*)

After the Plaintiff emailed O'Connor with her concerns, he contacted Bob Roper, the

Regional Human Resources specialist. Roper contacted the Plaintiff and told her that she was not

required to perform the activities she expressed concern about. O'Connor also informed Wetters

that the Plaintiff had contacted him and that O'Connor was working with the HR department.

The Plaintiff was not required to perform any of the tasks that she complained about.

With respect to the parade, Wetters distributed a written note to employees on July 27 that

described the Defendant's participation in the Blueberry Festival, including the parade. He

indicated that employees could walk and pass out candy or ride on the cylinder truck and wave. He encouraged everyone to attend and to bring family, and explained employees would be paid for three hours. Wetters stated that if anyone was not able to attend, they should talk to him or Ed Read.

**C.      The Defendant's Follow-Up Attempts to Facilitate Meeting with the Plaintiff**

Based on her email communications, the Defendant attempted to set up a time for O'Connor and Roper to talk with the Plaintiff about how to move forward, and to discuss her basic job duties and any accommodations she might need. O'Connor and Roper also asked Wetters and the Plaintiff's direct supervisor, Twila Eenigenburg, to attend. When she was hired, the Plaintiff signed a CSS job description and a document that set forth the essential functions for propane-related positions. The basic functions for all positions included certain field tasks. The Defendant intended to discuss these documents and then create a non-propane related positions document. According to the Plaintiff, none of the field tasks were discussed with her during hiring interview, and she was hired to perform office work only.

The Plaintiff continually refused to participate in a meeting to discuss her accommodation request. She wanted a person who specialized "in the rights of disabilities in the workforce" to accompany her and represent her interests at the meeting. (7-26-11 email, ECF No. 63-12.) She expressed concern with the "direction I feel this issue is being taken in." (*Id.*)

During this same time, Wetters and Roper discussed moving the accounts payable function to Eenigenburg. Wetters had been wanting to transition the function since July 3, but

Eenigenburg's P-card was delayed because the Defendant was changing card providers. The Plaintiff was going on vacation in July at the same time the Defendant's fiscal year was ending. After discussions, Roper directed Wetters to tell the Plaintiff that the Defendant was moving the accounts payable function to Eenigenburg. Wetters called the Plaintiff on July 27, 2011, and advised her that the Defendant was moving the accounts payable functions to another employee. The Plaintiff thought that Wetters was supposed to be extending an apology to her, and alleges that, instead, Wetters yelled at her. She became upset, started sobbing, and told Wetters that she was calling Roper. The Plaintiff called 911, but does not recall doing so intentionally. The Plaintiff also called Roper to complain about Wetters. She told Roper that she was about to have a nervous break down and she was so distraught that Roper recommended that she take paid time off leading up to her planned vacation.

While the Plaintiff was on vacation, the Defendant's July receipts were transferred from the Plaintiff's office to Eenigenburg for completion of the appropriate reports, consistent with the transfer of the AP duties. On August 10, 2011, after she returned from vacation, the Plaintiff sent Roper an email stating that she was "not sure how this whole situation has been resolved. I still am not sure what to expect as far as my title, job or anything." (Email (Aug. 10, 2011), ECF No. 63-11.) She complained again about the way Wetters spoke to her and stated she was "stressed and very uncomfortable working for him. I believe he wants me to feel this way and wants me gone now that I asked for assistance with the main issue of my limitations. I honestly do not know who to trust any longer. This whole situation has made me actually ill due to being so upset. What's the resolution?" (*Id.*) In Roper's response, he assured the Plaintiff that neither her job title nor her job had changed. He also explained:

The A/P duties are transitioning to the Lead CSS position for business reasons Greg has previously discussed with you. Along with your regular duties, you are expected to maintain a level of professionalism in your phone and personal contacts with your coworkers and customers. As you admit, this has not been occurring on a consistent basis.

As previously stated many times, Ferrellgas will make every effort to accommodate within reason any restrictions you may have that prevent you from performing your job duties. As previously requested, please let Greg, Twila, or even myself know of any restrictions or accommodations you may have so we can know what they are and give them our attention and consideration.

As a next step, I have asked Greg to be available for a conference call with you and me. The purpose of the call is to clarify any questions you have about your job duties and responsibilities, and for you to let us know of any restrictions and what accommodations you may need to successfully do your job.

(*Id.*) Roper ended by discussing the logistics of the conference call. The Plaintiff responded to Roper. She wrote:

That is fine however, Greg never discussed this with me in the conversation we had on Wednesday he was very rude in speaking with me and just translated that he was taking the duties for AP away from me. Which the way it was handle[d] and the talks we had the previous week before all this started with my email to Rick O'Connor, was that the guys were to come to me for any replacement uniforms, I would be getting a company phone so that I could stop using my personal cell for all the AP duties, the timing of this change is a little disturbing even if as you say it's for business reasons which makes me believe that it's so he does not have to touch base with me any longer on this level. This was the duty I was told I was being hired for, I was to replace the AP duties from Sarah, He was waiting for me to be trained and for the departure of the past Lead CSS.

I still would like to know how the issue of how he stated that me not doing certain things would make me be looked upon differently is being handled.

(*Id.*)

Roper assured the Plaintiff that the conference call would be a good time to discuss her questions. (*Id.*) The Plaintiff then informed Roper that she would be recording the conversation. He replied that she did not have permission to record the call, that it would be a violation of

company policy to do so, cited to the policy number, and assured the Plaintiff that the call was "a standard business meeting." (*Id.*)

The Plaintiff reiterated her displeasure with the manner in which her removal from the accounts payable function had been handled and stated that she had "lost my trust and respect for [Wetters] and a few others on the way this was handled and supposedly resolved." (*Id.*) The Plaintiff had expected an apology from Wetters on the day that he, instead, informed her that the Defendant was moving accounts payable to another employee. She defended her job performance and stated she had been "nothing but professional in all factors of it." (*Id.*) The Plaintiff demanded that someone else participate in the phone conference who was "outside of Greg's control and who can be witness." (*Id.*)

Roper told the Plaintiff that the call was "an ordinary business meeting between you and your manager" and that the purpose was for Wetters to answer the questions she had, and for her to provide information to help the Defendant know her restrictions or accommodations. (*Id.*) He advised that "[a]s a member of Human Resources and outside of Greg's control, I will be on the call to witness that process and help in any way possible." (*Id.*)

The next day, August 11, the Plaintiff emailed Roper the following response:

I wasn't referring to you as being under Greg's control, I was referring to any other possible witness, but you are part of FG and I honestly do not trust how any of this has been handled. You are not here everyday and I believe without the watchful eye he will treat me as he did that Wednesday. As you are aware I was so distraught after the call that I was beyond tears at how he spoke to me and you had to give me the paid time off before my vacation even started.

I still have not received my p-card receipts to review for my expense account and they were all there and in order prior to my leaving and when I took over the position when he spoke to me about being glad that the last employee was gone and how they were trying to prove that her and the old OM were stealing, I do not trust that he wouldn't do the same to me after the way he has treated me the last

couple of months, to want me gone. I did not know them that well so I do not know the whole story, buy the fact that he was so forth giving with the information and seemed happy about it.

(*Id.*) The Plaintiff then expressed her belief that accounts payable change was a response to her asking "for help above [Wetter's] title." (*Id.*) She stated that she was not comfortable meeting without a witness, that she did not need clarification on her CSS job description, and that she hoped Wetters would be reprimanded for writing that he would look at her differently if she did not attend the parade. (*Id.*)

Roper said they could discuss any of these issued during the scheduled conference call. The Plaintiff wrote, "The meeting needs to be postponed until I have a chance to discuss with [an attorney] my request to have a bystander that I trust in on any of the talks pertaining to my job and the issues already on the table." (*Id.*) Roper agreed to postpone the call until the next day, but reminded the Plaintiff that it was an ordinary business meeting that Roper had recommended in response to the Plaintiff's emails. (*Id.*)

The Plaintiff wrote in reply,

Forgive me Mr. Roper, but since that Wednesday [when Wetters informed her that AP duties were being transferred], nothing is ordinary about any of this now. It may have been if all worked out as we discussed prior to his phone after you spoke back with him about it all, but now I cry everyday, I don't sleep from the stress and have never felt so uncomfortable about coming to work in my life.

(*Id.*)

As these emails were being exchanged, Wetters responded to the Plaintiff's accusations and assertions and provided Roper with examples of the Plaintiff's unprofessional actions in the workplace, particularly as it related to her interactions with vendors, co-workers, and the local management team. For example, Wetters relayed that he was informed that the Plaintiff yelled at

a Ferrellgas driver who inquired on the status of shoes the Plaintiff was directed to order for him. The report was that the Plaintiff went into a tirade about it not being her responsibility and that he should call Twila Eenigenburg. Wetters also relayed instances where the Plaintiff had become so distraught that she could not continue a business conversation.

Meanwhile, the Plaintiff continued to send emails to Roper about the receipts that were removed from her office. She stated that she was requesting the receipts because she was taking care of the expense report through the last of the month and had a "right to review them." (8-12-11 email, ECF No. 63-10.) She stated that Eenigenburg could be present, but that she did not trust Wetters and wanted to make sure everything was in order. Roper responded that the receipts could be addressed during the conference call. The Plaintiff replied: "I am not having this call as recommended until I have seen for myself that all is ok with this, I have also been advised that my request for a party being present that I consider trustworthy is a right. Now if you are denying me that request officially. Please let me know."
(*Id.*)

At the scheduled call time, Roper assured the Plaintiff through email that the call was intended to be helpful and that the Defendant wanted to work with the Plaintiff. He asked if she was ready to connect on the call. (*Id.*) The Plaintiff responded that she was "not having a verbal meeting with [Wetters] until I can for myself verify that he has not tampered with my expenses" and she was able to have a trusted witness. (*Id.*) She reiterated that she already knew her job duties, and that she could write out her restrictions.

Roper wrote that because she stated she knew her job duties, he would inform Wetters that there was "no need for that discussion today. Please write out the restrictions or

accommodations you need and that we can help with. An email from you is fine, or a note from your doctor would also be welcome." (*Id.*) Roper encouraged the Plaintiff to continue to work with Wetters and Eenigenburg "going forward, as would normally occur." (*Id.*)

The Plaintiff followed up by "officially requesting" the expense receipts from the previous month. She indicated that she would provide a list of her restrictions, but that she would "not subject myself to direct contact with Greg Wetters until a resolution is satisfied on both ends concerning the inappropriate way he treated me." (*Id.*)

On August 15, the Plaintiff again contacted Roper to request the July receipts. She said, "If I do not [hear] back about these once again, I will follow through with the next steps to try to have all the issues not resolved yet, resolved." (Email (Aug. 15, 2011), ECF No. 63-10.) The Plaintiff said that she would contact a "higher office here at Ferrellgas." She acknowledges that, while she was accommodated for her limitations, "[n]othing has been resolved about the way he made me feel with his pressuring of the activities or his insinuations if I didn't do activities he was telling me I would need to do with the way he treated and spoke to me the day after I spoke with you concerning the issues. Instead, I was removed from my position in a horrible way." (*Id.*)

Later that day, the Plaintiff sent an email to Wetters listing her restrictions related to walking, especially on uneven or cluttered ground. She stated that exposure to humidity or cold could affect the fit of the prosthetic leg.

**D.     Final Written Warning**

Roper, with Wetter's input, had started putting together a Final Written Warning for the

Plaintiff. Roper and Wetter also conferred with O'Connor to make sure he understood their plan to issue the Final Written Warning and supported it. On August 15, 2011, Wetters met with the Plaintiff at the Francesville office, where Wetters presented the Plaintiff with the Final Written Warning Roper had drafted. The Warning addressed concerns with the Plaintiff's work quality, her conduct/communication, and acts of insubordination. Eenigenburg was also present at the Francesville office so that someone was there when Wetters met with the Plaintiff. The Plaintiff became visibly upset and refused to sign the document. Given her emotional state, Wetters told the Plaintiff to go home. When the Plaintiff raised concerns about the cash drawer, Wetters told her she did not need to stay to count the cash drawer. The Plaintiff disagreed with Wetters and told him that she wanted Eenigenburg to count the cash drawer before she left the office. The Plaintiff only left after Eenigenburg did so. In her deposition testimony, the Plaintiff explained that she refused to follow Wetter's directive to go home "before I knew in my own mind and heart that my responsibility cash-wise was resolved." (Alderson Dep. 200–01, ECF No. 63-3.)

### E.       Final Meeting and Termination From Employment

The next day, August 16, 2011, the Plaintiff  was directed to report to work at the La Crosse location with Eenigenburg because the Plaintiff's emotional responses did not give the Defendant confidence in her ability to deal with customers by herself. According to Eenigenburg, the Plaintiff asked Eenigenburg to take the Plaintiff's store key because she did not want to be responsible for a key that opened the doors to five locations.

Despite the Plaintiff's refusal to meet, the Defendant decided the best course of action would be to meet again with the Plaintiff and communicate the basic job requirements for her

16

position. Although the Plaintiff claimed to understand her job duties, the Defendant did not believe she was displaying an ability to conduct herself in a professional manner and do her job duties. Roper emailed Wetters a document that clarified the Plaintiff's job duties and expectations. These included taking back the office key; being available to talk with all co-workers related to business matters; to stop discussing the previous decision to transfer AP duties to the Lead CSS position; to work without direct supervision when necessary; to count the cash drawer at the beginning of each shift; to talk and engage professionally with co-workers and vendors, and; to work with Wetters by reporting directly to him, meeting with him when requested without demanding that another person be present, respecting his decisions, and having conversations about her performance. All of the expectations were a response to actions or statement that the Defendant believed the Plaintiff had made, such as turning in her key, and asking that another employee confirm her cash drawer at the end of the day.

Roper coached Wetters on how to conduct the meeting with the Plaintiff, advising him to go through each duty and give the Plaintiff a final chance to commit to the job and honor the expectations. He stated that if the Plaintiff refused one or more of the duties, to advise her that the duties were required, that refusal would be insubordination, and that her employment would be terminated immediately.

Wetters conducted the meeting as instructed by Roper. He informed the Plaintiff that if she indicated she was unwilling to perform any of the duties and expectations, it would be considered insubordination. Wetters stated that, because the Plaintiff would be required to open or close a location, she needed to take back her office key. The Plaintiff initially refused, but then said she would do so, but only if someone else counted the cash drawer. However, the

Plaintiff was the only employee in the Francesville location. The Plaintiff agreed she could talk with all co-workers related to business matters. The Plaintiff would not answer questions about the AP duties decision. She also refused to answer when asked whether she would be able to work alone and without direct supervision, and whether she would follow the procedure of counting her own cash drawer. The Plaintiff agreed that she could talk with co-workers, vendors, and customers professionally. She did not agree to work under Wetters's supervision.

After telling the Plaintiff that she was going to leave him "no choice" about termination, Wetters began to read through the items the Plaintiff had not answered in the affirmative. Her responses did not change. The meeting ended with the Plaintiff's termination from employment. The Plaintiff told Wetters that she would sue the Defendant. According to the Plaintiff, as she rose to leave, Wetters told her, "I have a team of lawyers and you don't have a leg to stand on."

**F.      Unpaid Overtime Claims**

The Plaintiff's regular schedule was 8:00 a.m. to 5:00 p.m., but she would occasionally arrive later or leave earlier. Ferrellgas policy requires employees to accurately report the number of hours actually worked each day using a Ferrellgas computer program. It also requires employees to obtain permission prior to working overtime, but even unapproved overtime is paid if it is reported. For most weeks, the Plaintiff's reports show her working on Monday through Friday from 8:00 a.m. to noon, and 1:00 p.m. to 5:00 p.m., for a total of 40 hours per week. The reports also show times when she worked less than 40 hours, worked outside her regular

schedule, and worked overtime.[2]

As part of her AP duties, the Plaintiff purchased supplies and distributed them to other locations. The Plaintiff identifies four weekends in March and April 2011 where she estimates that she averaged four hours of overtime to purchase and deliver supplies to various Ferrellgas locations. She also identifies four weekdays where she purchased materials before arriving at the office (but after 8 a.m.) or during lunch (although one of the January 25th receipts records a transaction time of 1:09 p.m. and the Plaintiff's time records for the same date record her working at 1:00 p.m.). The Plaintiff's time reports do not show any reported hours on a weekend, and the Plaintiff never attempted to enter time for a weekend. Nor did she submit overtime that was rejected. The Plaintiff maintains that Wetters preferred that the Plaintiff make purchases for the Defendant after office hours and on weekends so that the Plaintiff would remain in the Francesville office to answer phones. She contends that she asked him about recording the time, and he said "We'll figure something out" but that "nothing ever came about it." (Pl.'s Dep. 220, ECF No. 70-1.)

The Defendant did not specifically claim to anyone at Ferrellgas that she was working overtime, but "started mentioning to [Wetters] about the time it took" and that it was "affecting [her] weekends when [she] had to do it." (Pl.'s Dep. at 226, 229.) When she "told them

---

[2] For example, the Plaintiff recorded 32 hours worked the week of May 31, 2010 (Memorial Day off), the week of June 28, 2010 (Friday off before Fourth of July), 24 hours the following week, 36 hours in 4 days during the week of August 16, 2010, 42 hours the week of August 23, 2010 (including 7 hours on Thursday and 11 hours on Friday), 32.25 hours the week of September 6, 2010 (Labor Day off), 32 hours the week of September 20, 2010, 39 hours the week of September 27, 2010, 32 hours the week of November 22, 2010, 32 hours the week of December 20, 2010 (Christmas Eve off), 33.5 hours the week of December 27, 2010, 32 hours the week of January 31, 2010, 16 hours the week of March 21, 2011, 32 hours the week of March 28, 2011, 39 hours the week of April 11, 2011, 32 hours the week of April 25, 2011, 32 hours the weeks of May 23, 2011, and May 30, 2011, 32 hours the weeks of June 27, 2011, and July 4, 2011, and 32 hours the week of July 18, 2011.

specifically I do not want to do my shopping later in the evening, that I wanted to leave early to get it taken care of, then he would okay—finally okay that." (*Id.* at 222.) According to Wetters, when he learned that the Plaintiff intended to make purchases on a weekend, he directed her to make all purchases online and have them shipped to the plant instead. (Wetter's Dep. 164, ECF No. 63-4.) Wetters reviewed time sheets each week, but he was not present at the Francesville location to know if the Plaintiff worked the exact hours that she reported.

## STANDARD OF REVIEW AND PENDING CLAIMS

The Plaintiff acknowledges that she is no longer pursuing a disability discrimination claim or a gender-based hostile work environment claim [ECF No. 70 at 24]. The parties dispute who is to blame for the fact that these claims were not dismissed prior to the briefing on summary judgment in June 2014. In April 2014, the Plaintiff advised the Defendant that she was willing to dismiss the claims. However, no submissions were made to the Court to effectuate a dismissal. The Defendant claims that the Plaintiff should have dismissed the claims, either on her own or by requesting that the Defendant stipulate to their dismissal. The Plaintiff asserts that the Defendant did not agree to stipulate to a dismissal, but does not clarify whether she actually sought the Defendant's agreement. For its part, the Court is satisfied that the Plaintiff is no longer pursuing claims for disability discrimination or hostile work environment based on gender. Additionally, the Plaintiff states in her Response that she "is willing to voluntarily dismiss Count V of her Complaint for conversion." (Pl.'s Resp. 25, ECF No. 69.)

The standards applicable to summary judgment are well established.[3] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). A district court should deny a motion for summary judgment only when the non-moving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); *Swearnigen–El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). "Irrelevant or unnecessary facts do not deter

---

[3] The Plaintiff asserts in her Response in Opposition to Defendant's Motion for Summary Judgment that the Seventh Circuit "has held that summary judgment is usually inappropriate in employment discrimination cases." (Pl.'s Resp. 3 (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997).) The Plaintiff arrives at this erroneous assertion by highlighting an incomplete statement from *Wallace*. While the court did say that "[l]anguage in some of our cases implies that because intent is a critical issue in employment discrimination cases, summary judgment is unlikely to be appropriate in such cases," it went on to clarify that "there is not a separate rule of civil procedure governing summary judgment in employment discrimination cases," and that the language from those cases "really just means that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." 103 F.3d at 1396. In fact, summary judgment is common in employment discrimination cases. *Id.*

summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

## ANALYSIS

### A.      Retaliation Claims

The Plaintiff alleges that her termination from employment was the result of her requests for an accommodation. The Plaintiff asserts that removing the accounts payable duties and giving her a final written warning were also retaliatory. A plaintiff may proceed under either the "direct" or "indirect" method of proof to establish this type of claim. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). "[B]oth methods are directed at the 'fundamental question at the summary judgment stage, which is simply whether a reasonable jury could find prohibited discrimination.'" *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) (brackets omitted).

The Plaintiff presents her case under the direct method.[4] Accordingly, she must present

---

[4] The Plaintiff also devotes a section of her brief to the indirect method of proof, but the arguments are essentially the same save for a short discussion about similarly-situated employees. The Plaintiff identifies the other two CSSs as similarly situated, but does not attempt to show that they engaged in "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). "[I]n deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Peirick v. Univ.-Purdue Univ.-Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). Here, the Plaintiff has not indicated what conduct she believes her comparators engaged in, much less designated evidence to suggest that the proposed comparators are "similar enough to permit a reasonable juror to infer, in light of all the

either direct or circumstantial evidence that her employer's actions were based on prohibited animus. *See Dickerson*, 657 F.3d at 601. The Plaintiff asserts that the circumstantial evidence raises an inference that her employer took action to terminate her employment in retaliation for requesting an accommodation. Under this approach, "the plaintiff must connect the circumstantial evidence to the employment action such that a reasonable juror could infer the employer acted for discriminatory reasons." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012). Such circumstantial evidence may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659–60 (7th Cir. 2013) (quoting *Dickerson*, 657 F.3d at 601). "The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity. To answer that question, the individual 'bits and pieces' presented by the plaintiff must be put into context and considered as a whole." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013).

The Plaintiff asserts that she was terminated for seeking accommodation of her disability, for complaining of disability discrimination and retaliation by Wetters, and for writing to O'Connor that she would complain to the Department of Labor. The circumstantial evidence in the record, construed in a light most favorable to the Plaintiff, does not constitute a sufficient

circumstances, that an impermissible animus motivated the employer's decision." *Coleman*, 667 F.3d at 841.

basis for a jury to infer that these actions—as opposed to the Plaintiff's own insubordination—were the basis for the Defendant's decision to terminate her employment. The Plaintiff relies heavily on temporal proximity, arguing that after she complained to O'Connor, Roper asked Wetters for examples of the Plaintiff's poor job performance. She argues that "[t]his immediate response from HR clearly evidences a causal connection between the two. A reasonable trier of fact could conclude that [the Plaintiff's] termination was a foregone conclusion and HR intended to terminate [the Plaintiff] because she engaged in protected activity, regardless of the results of its investigation." (Pl.'s Resp. 7–8.) This is speculation, not a reasonable inference. To be fair, the involvement of the human resources department was a response to the Plaintiff's complaints and accusations against Wetters. But the Plaintiff has no evidence to suggest that this involvement was improper, much less that it was a conspirative preliminary step to a "foregone conclusion" about her employment.

First, "suspicious timing alone is almost always insufficient to survive summary judgment." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011). "'The mere fact that one event preceded another does nothing to prove that the first event caused the second. . . . [O]ther circumstances must also be present which reasonably suggest that the two events are somehow related to one another.'" *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)); *see also Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (noting that under ordinary circumstances, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is *other* evidence that supports the inference of a causal link") (internal quotation marks omitted,

emphasis added).

> Suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment. Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible. Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context, just as an evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory.

*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (citations omitted); *see also Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 495–96 (7th Cir. 2014) (emphasizing that "suspicious timing must be evaluated in the context of the whole record").

Second, engaging in protected activity does not immunize an employee from being disciplined or terminated for workplace behavior, *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 376 (7th Cir. 2007); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002), and "where a significant intervening event separates an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail, *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (internal quotation marks and brackets omitted). The Plaintiff's written warning and termination were the result of significant intervening events of insubordination and unprofessionalism that separated her complaints from the adverse employment action. Although her employment was terminated shortly after her complaints about job duties, the decision was the culmination of the consequences of those intervening events. During this time, the Plaintiff continually refused to participate in meetings with her employer, accused her supervisor of taking receipts so that he could frame her for theft, demanded to complete the accounts payable report after the duties were transferred, and communicated unprofessionally with coworkers and local management. The shift in her behavior throughout

July and August 2011 culminated in her refusal to (1) sign a written warning; (2) to agree to work alone and without direct supervision; (3) to follow the procedure of counting her own cash drawer, and (4) to work under Wetters's supervision. During this same time, the communications from her employer express a desire to achieve a resolution.

The Defendant was under no obligation to forego action that was adverse to the Plaintiff simply because she complained of its actions. *See, e.g., Love v. City of Chi. Bd. of Educ.*, 241 F.3d 564, 570 (7th Cir. 2001) ("We have consistently held that an employee's insubordination toward supervisors and coworkers, even when engaged in protected activity, is justification for adverse employment action.") (quoting *Kahn v. United States Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (brackets and alteration omitted)). The Plaintiff downplays her antagonistic behavior, but "a plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions." *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996). Rather, she must establish that the Defendant did not genuinely believe that the Plaintiff's actions were insubordinate. That is, she must show that the reason was pretextual.

"Pretext means a dishonest explanation, a lie rather than an oddity or an error. Pretext is more than a mistake on the part of the employer; it is a phony excuse. Showing pretext requires proof that the defendant's explanation is unworthy of credence." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (citations, brackets, and quotation marks omitted); *see also Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) (stating that even if an employer's reason for terminating an employee is "mistaken, ill considered or foolish," pretext has not been shown as long as the employer "honestly believed those reasons"). It is not "the court's concern that an

employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000) (internal citations omitted).

As evidence of pretext, the Plaintiff notes that, prior to July 2011, there were no documents to suggest that her "performance was seriously deficient and worthy of disciplinary action." (Pl.'s Resp. 17, ECF No. 69]. However, "[t]he question is not whether [the Plaintiff] *ever* satisfied the [Defendant]'s expectations, but whether [the Plaintiff] met the [Defendant]'s expectations *at the time she was fired*." *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (citing *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545–46 (7th Cir. 2002)). Further, an employer's legitimate expectations are not limited to actual job performance, but include "factors such as insubordination and workplace camaraderie." *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007).

The Plaintiff also questions the fact that she was not given "a reasonable time frame" after receiving the Final Written Warning to correct the documented behavior, as is recommended by Ferrellgas policy. The Plaintiff ignores the fact that she refused to sign the Written Warning. Moreover, her actions the following day led to her termination for insubordination. With respect to that decision, the Plaintiff argues that there is evidence that the Defendant's stated reason for her termination at the August 16, 2011, meeting was false. She submits that she indicated she could perform some of the functions Wetters described to her, and maintains that she was upset and confused by Wetters's questioning, which is "hardly evidence that [she] could never again perform the essential functions of a CSS." (Pl.'s Resp. 21, ECF No.

69.) The Plaintiff's argument misses the point. It has never been the Defendant's position that the Plaintiff was incapable of performing the CSS duties if she chose to do so. But she did not give an affirmative response to all of Wetters's questions about her duties, despite being warned that failure to acknowledge any one of the duties would be considered insubordination. She believes this should not have mattered because she was "upset that her requests for accommodation and complaints of retaliation caused a substantial change in her job duties, responsibilities and work site." (*Id.*) The reason the Plaintiff failed to acknowledge all of the duties Wetters presented to her is not relevant. All that matters is whether the Defendant honestly regarded the Plaintiff's responses to be insubordinate. On that point, the Plaintiff has no contradictory evidence.

Neither does the sequence of events, viewed in context, support an inference of retaliation with respect to the removal of the accounts payable function. The designated evidence shows that Wetters had decided to remove the duties from the Plaintiff before any of the communications in July regarding her participation in the parade or her emails to O'Connor. He took steps for a p-card to be issued to the lead CSS, Twila Eeginenburg, on June 3. Despite this undisputed date for application of the card, the Plaintiff argues that there is evidence to dispute that the Defendant planned to transfer these duties to Eenigenburg before the Plaintiff engaged in protected activity. As proof, the Plaintiff points to the fact that Eeginenburg did not know about the transfer until it occurred in late July. The fact that Wetters did not inform Eenigenburg of the details of his plan does not contradict the card application date.

In any event, under either method of proof, the Plaintiff would be required to show that the removal of the accounts payable duties was a materially adverse action. *See Brown v.*

*Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (direct method); *Harper v.*

*C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) (indirect, burden-shifting approach). An

action is materially adverse for purposes of retaliation if it "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted). "[A] lateral

transfer without a loss of job benefits does not constitute an adverse employment action." *Stutler*

*v. Ill. Dep't of Corr.*, 263 F.3d 698, 702 (7th Cir. 2001). Neither does the removal of a simple

duty that is not part of the job description, is commonly moved among eligible employees, that

has no connection to wages or benefits, and that does not impact career prospects or promotional

opportunities. The Plaintiff appears to have had a preference for maintaining responsibility for

the AP duties (or, at least a preference that they not be removed by Wetters). But "personal

preference is not sufficient to establish an adverse action . . . [or] the objective requirement for

such a finding would effectively be eliminated and federal employment law would become a

mechanism for enforcing employee preferences rather than remedying materially adverse

treatment." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009). By the

Plaintiff's own admission, the removal of AP duties did not impact her day-to-day duties. (Pl.'s

Dep. 173, ECF No. 70-1.) Her objection was "how it was done and portrayed that affected me."

(*Id.*)

    But even if Wetters "yelled" at her during the telephone conversation when he told her

about the transfer, this does not objectively rise to the level of being materially adverse because

it would not dissuade a reasonable worker from complaining of discrimination. *See, e.g., Henry*

*v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008) (finding that unspecified intimidation,

door slamming by superiors, missing or marked up time cards, and other incidents were petty slights and mere annoyances rather than materially adverse actions capable of sustaining a retaliation claim). The Plaintiff's response, far from being that of a reasonable worker, was that of an extremely sensitive one. She immediately called Roper and said she was on the verge of a nervous breakdown, and was so distraught that Roper recommended to her that she take paid time off. When she returned to work after taking a planned vacation, she drafted an email to complain about the way Wetters spoke to her, stating that she was "stressed and very uncomfortable working for him. I believe he wants me to feel this way and wants me gone now that I asked for assistance with the main issue of my limitations. I honestly do not know who to trust any longer. This whole situation has made me actually ill due to being so upset." (8-10-11 email, ECF No. 63-11.) Even viewing the evidence most favorably to the Plaintiff does not reveal sufficient evidence to conclude that the transfer of the accounts payable duties was punitive action, much less punitive action taken because the Plaintiff complained to human resources about potential field work.

The Plaintiff claims that she has other evidence of retaliation in the form of ambiguous oral and written statements by Wetters. She points to Wetters's response to her email about the Blueberry Festival. (Pl.'s Resp. 12–13 (referring to Wetters's email statements that he could not expect all employees to participate except the Plaintiff, and that if she refused to participate she should not expect it to be viewed as a positive by him or her peers).) It is not clear what the Plaintiff believes are the implication of these statements as it relates to her retaliation claim. The reasonable inference of the statements, viewed in context with the entirety of the communications, is that Wetters believed the Plaintiff's negative response to participating in the

Blueberry Festival was detrimental to the team, that he desired all employees to attend what he believed was the company's most important event of the year, he did not want to make an exception for the Plaintiff merely because she had conflicting plans, and that choosing not to attend would not help her relationships with her coworkers. Even if some of Wetters's statements could be construed as hostile toward the Plaintiff, retaliation "calls for evidence of adverse employment action linked to a protected activity, not just evidence of problematic hostility." *Hutt v. Abbvie Prods., Inc.*, 757 F.3d 687, 694 (7th Cir. 2014). The statements the Plaintiff highlights were made *before* the Plaintiff made any mention of requiring an accommodation. Up to that point, the Plaintiff's complaints had been about taking time away from a camping trip with her husband and friends on a holiday. Thus, the necessary link to protected activity is missing.

In her statement of facts, the Plaintiff asserts that Eenigenburg "observed Wetters to have frustration from [the Plaintiff's] accommodation requests." (Appendix ¶ 14, ECF No. 70 (citing Eenigenburg Dep. at 86).) The Plaintiff's submission of this fact appears intended to support an inference that Wetters was opposed to accommodating the Plaintiff's disability. But Eenigenburg's testimony paints a different picture:

> Q.    Did you ever hear anybody say anything negative about Jenni because of those concerns [about performing certain duties] that she had?
> A.    I would say only that the consensus of the other CSSs was they weren't mandatory and arrangements could be made for her. I think we —
> Q.    Did you ever hear Greg say anything negative about Jenni having concerns about those?
> A.    Frustration that she didn't think we could make accommodations for her.

(Eenigenburg Dep. 86–87, ECF No. 70-3.) The source of Wetters's frustration then, according to Eenigenburg, was not that he had to make an accommodation, but that the Plaintiff lacked

confidence in the Defendant's ability to accommodate her.

The Plaintiff also claims that Wetters repeatedly told her that he would not be the one to be fired if she complained to "higher authority at Ferrellgas" about extra duties. (Pl.'s Resp. 13.) The Plaintiff concludes that the implication of these statements was that, instead, the Plaintiff would be fired "for going over his head at Ferrellgas to seek accommodation of her physical limitations and/or complaint of disability discrimination and/or retaliation." (*Id.*) There is too little context to the statement to justify such a broad conclusion. The Court's "favor toward the nonmoving party on summary judgment 'does not extend to drawing inferences that are supported by only speculation or conjecture.'" *Brown*, 700 F.3d at 1108 (7th Cir. 2012) (quoting *Harper*, 687 F.3d at 306).

Finally, the Plaintiff points to Wetters's statement, which he purportedly made after her termination and in response to her announcement that she would sue the Defendant, that he had a team of lawyers, and she did not have leg to stand on. She claims that this is an ambiguous statement that a reasonable trier of fact could rely on to conclude that the Plaintiff was fired for going over Wetters's head at Ferrellgas to seek an accommodation of her physical limitations or complaint of discrimination. The Court does not see how this is a statement "from which an inference of retaliatory intent might be drawn." *Taylor-Novotny*, 772 F.3d at 495 (providing the kind of circumstantial evidence that can support "an inference that retaliatory animus was at work").

In sum, the record does not support a determination that the Plaintiff's termination, or any of the other actions about which she complains, were retaliatory. An examination of the evidence yields no basis for the inferences that the Plaintiff would ask a jury to draw, and the

Court will grant summary judgment in favor of the Defendant on the retaliation claims.

**B.      Fair Labor Standards Act Claim**

The FLSA guarantees that employees who work "for a workweek longer than forty hours" receive compensation for the employment in excess of forty hours at "a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1)(C). "In an action under the FLSA for overtime wages, the plaintiff must establish a *prima facie* case by showing that he or she worked in excess of forty hours in a work-week." *Adkins v. Mid-Am. Growers, Inc.*, 831 F. Supp. 642, 644 (N.D. Ill. 1993) (citing 29 U.S.C. § 207). Employers bear the ultimate responsibility for ensuring that employee time sheets are an accurate record of all hours worked by an employee. *See* 29 U.S.C. § 211(c); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 314–15 (7th Cir. 1986). However, a plaintiff bears the burden of proving she performed overtime work for which she was not compensated. *Anderson v. Mt.Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded on other grounds by* Portal to Portal Act of 1947, 29 U.S.C. §§ 251–62. In addition, an employee is not considered to be "employed" unless he is "suffer[ed] or permit[ted] to work." 29 U.S.C. § 203(g). Under this definition of employ, the Plaintiff must show that the Defendant had "actual or constructive knowledge" of his overtime work. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (holding that the FLSA does not "requir[e] the employer to pay for work it did not know about, and had no reason to know about"); *see also* 29 C.F.R. § 785.11 (stating that work that the employer does not request may still be suffered or permitted if the "employer knows or has reason to believe that he is continuing to work and the time is working time").

The Plaintiff alleges that she occasionally made purchases on weekends, and that the Defendant knew she did this. She cites four different weekend dates, March 5, 2011, and April 2, 16, and 30, 2011, where she made such purchases and deliveries. But she does not indicate how the Defendant had knowledge that she was performing this work, or that it should have known that this caused her to work more than 40 hours. She never recorded the time or requested payment for the time she spent shopping on these dates. She does not allege that the Defendant instructed her not to report overtime. *Cf.,Blakes v. Ill. Bell Tel. Co.*, 75 F. Supp. 3d 792, 811 (N.D. Ill. 2014) (no summary judgment where supervisor gave task and told plaintiff that it was a "no overtime" job that needed to be completed regardless of the time it took and plaintiff was told he had to "make a sacrifice for the team" when he complained about working through lunch for a job); *Brennan v. Quest Comm'ns Int'l, Inc.*, 727 F. Supp. 2d 751, 761 (D. Minn. 2010) (denying summary judgment in case in which plaintiffs presented evidence that their employer "insisted that [they] put down a lunch every day . . . even though [they] didn't . . . take a lunch"); *Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068, 1072 (N.D. Ill. 2005) (plaintiffs "testified that they were repeatedly instructed to record on their time sheets only forty hours of work per week, despite the number of hours actually worked, and that if they did report overtime, they were required to change their time sheets before they were submitted."); *Cunningham v. Gibson Elec. Co.*, 43 F. Supp. 2d 965, 976 (N.D. Ill. 1999) (the defendant's president saw the plaintiff working after regular hours and "personally instructed" the plaintiff not to report overtime hours that he worked). Although the Plaintiff states that Wetters asked if she could do the shopping in the evening or on Saturday so she could stay in the office to answer the phones, her testimony about the subject of recording her time is inconclusive. "Q. But he

34

never told you not to put down the time? A. When I asked about the time, he said, We'll figure something out, if I recall, but nothing ever came about it." (Pl.'s Dep. 220.) This does not create an inference that Wetters had knowledge that the Plaintiff was working overtime. She submits receipts for week day times, specifically for purchases made at 8:53 a.m., 8:59 a.m., 12:32 p.m., 12:33 p.m., and 1:09 p.m., suggesting that the Plaintiff was not limited to making purchases in the evening and on weekends. In addition, the Plaintiff testified that when she asked if she could leave early to do the shopping, Wetters approved her request. (*Id.* at 222.) The Plaintiff does not indicate how she recorded her time on the days that she left the office early to do shopping.

According to Wetters, whose testimony on the subject was not ambiguous, he saw emails where the Plaintiff indicated she would pick up some items for the Defendant when she did her personal shopping that weekend. He told her to order the items online instead, and have them shipped to the appropriate facilities.[5] Each employee entered his or her own hours, and Wetters was not on location where the Plaintiff worked. He had no way of knowing if her hours reflected the time she was actually in the office, or whether she reported hours to account for weekend purchases. The Plaintiff does not point to anything to suggest that Wetters would have reason to believe that she continued working on weekends after he told her to make purchases online. The Plaintiff also testified that she mentioned to Wetters how much time the shopping took, but does not put a time frame on this conversation or indicate that her complaints included the fact that the time was not being compensated or caused her to work overtime.

Given Ferrellgas's policy to record time accurately, the Plaintiff's failure to request or

---

[5] The Plaintiff might not agree that this is a fact that the Court may consider, but nothing in the Plaintiff's submissions contradicts it, and it was a part of the designated evidence.

record overtime, the condensed time frame in which she performed weekend shopping, the fact that her complaints to Wetters did not include that she was working overtime, Wetters approval for the Plaintiff to leave work early to perform shopping, Wetters's directive to make purchases online when he learned she intended to shop on the weekend, and the Plaintiff's unsupervised occupation of the Francesville office, lead to the conclusion that the Defendant did not "sit back and accept the benefits" of the Plaintiff's work "without compensating" her for it. *Kellar*, 664 F.3d at 177 (quoting 29 C.F.R. § 785.13)); *see also Gaines v. K–Five Const. Corp.*, 742 F.3d 256, 270 (7th Cir. 2014) (because "an employer cannot slyly sit back in order to reap extra work without pay, it has no obligation to pay for work it did not know about and had no reason to know about" so the employee's unpaid overtime turned on whether he "presented a genuine issue of material fact as to whether [his employer] knew that [the plaintiff] worked an extra 15 minutes on certain days").

The Plaintiff's evidence does not create a genuine issue of material fact as to whether the Defendant was aware that she worked more than 40 hours on certain weeks to shop and make deliveries. Accordingly, the Defendant is entitled to judgment as a matter of law on the Plaintiff's FLSA claim.

## CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment [ECF No. 62] is GRANTED. The Defendant's Motion for Relief Due to Destruction of Evidence [ECF No. 60], and the Plaintiff's Motion to Deem Portions of Defendant's Reply Brief Waived of Stricken [ECF No. 73] are DENIED. The Clerk will enter judgment in favor of the Defendant and against

the Plaintiff.

SO ORDERED on August 31, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION